**In re EZ PAY SERVICES, INC., a/k/a EZ Pay Health Care, a/k/a EZ Pay Dental, a/k/a EZ Pay Medical, Debtor.**

**Alternative Debt Portfolios, L.P., a Delaware Limited Partnership, and Alternative Debt Portfolios, LLC, a Nevada Limited Liability Company, Plaintiffs,**

v.

**E–Z Pay Services, a Nevada Corporation, mydds.com, a Nevada Corporation, and Debra Distler, Defendants.**

**Bankruptcy No. 3:06–bk–2474–PMG.**

**Adversary No. 3:06–ap–333–PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

March 19, 2008.

Order on Motion for Clarification and Limited Reconsideration May 30, 2008.

Nicolette Corso Vilmos, Broad and Cassel, Roy S. Kobert, Orlando, FL, for Plaintiffs.

E–Z Pay Services, a Nevada Corporation, pro se.

Barry L. Breslow, Reno, NV, Bruce Alexander Minnick, The Minnick Law Firm, Tallahassee, FL, for Defendant.

**ORDER ON (1) EX PARTE MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATION OF EX PARTE TEMPORARY RESTRAINING ORDER, AND (2) THIRD MOTION FOR ORDER TO SHOW CAUSE WHY MS. DISTLER SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING TEMPORARY RESTRAINING ORDER**

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for an evidentiary hearing on June 15, 2007, and July 27, 2007, to consider the (1) Ex Parte Motion for Order to Show Cause Why Defendants Should not be Held in Contempt for Violation of Ex Parte Temporary Restraining Order, and (2) the Third Motion for Order to Show Cause Why Ms. Distler Should not be Held in Contempt for Violating Temporary Restraining Order. The Motions were filed by the Plaintiffs, Alternative Debt Portfolios, L.P. and Alternative Debt Portfolios, LLC (collectively, ADP).

he issue presented by the Motions is whether the Defendant, Debra Distler (Distler), violated the terms of a Temporary Restraining Order entered by the State Court in Nevada on July 19, 2006. ADP asserts that Distler violated the Order by soliciting certain medical providers to sue ADP for the recovery of payments

owed or remitted on the providers' patient accounts. According to ADP, the solicitation is contained in two letters written and sent by Distler on July 25, 2006, and February 25, 2007, respectively.

## Contents

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 450

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 453
 I. "Jurisdiction" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 453

 II. Contempt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 455
 A. The July 25, 2006 letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 455
 B. The February 25, 2007 letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

 III. Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458
 A. Compensatory damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 459
 B. Punitive damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 460

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461

## Background

The Debtor, EZ Pay Services, Inc., was engaged in the business of contracting with health care providers for the right to collect certain of the providers' patient accounts, in exchange for discount fees and other fees specified in the contracts. Distler was the Debtor's Chief Executive Officer and sole shareholder.

In June of 2005, the Debtor, as Seller, entered into a Purchase Agreement with ADP. (Main Case, Doc. 45, Exhibit B). Pursuant to the Agreement, the Debtor agreed to sell certain of its Contracts, as broadly defined in the Agreement, to ADP. Generally, the Purchase Agreement provided that the price for each Contract would be set forth in a separate Addendum, that delivery of the purchase price under the Agreement would constitute payment in full for the Debtor's interest in the Contracts, that the Contracts purchased would become the sole property of ADP, and that all payments owed by the patients under the purchased Contracts would thereafter be due to ADP.

On June 29, 2005, the Debtor executed a separate Provider Payment Guarantee, pursuant to which it agreed to "continue forwarding all payments due to Medical Providers and/or to settle balance in full with all Medical Providers as per the terms of the E–Z Pay Medical Provider Agreements." (Main Case, Doc. 45, Exhibit B).

Eric Gangloff (Gangloff), the managing director of ADP, testified that ADP paid the Debtor approximately $5,760,000.00 for the Contracts initially purchased in June of 2005. (Transcript, June 15, 2007, hearing, p. 25). Gangloff further testified that ADP made eleven additional purchases of Contracts from the Debtor in the year following the execution of the Purchase Agreement, for a total purchase price of more than $16,000,000.00. (June 15 Transcript, pp. 27–28).

In June of 2006, ADP determined that it would not purchase any additional Contracts from the Debtor. (June 15 Transcript, pp. 28–29).

On July 15, 2006, Distler wrote a letter to ADP in which she proposed that ADP purchase the Debtor's existing Provider Contracts for the sum of $2,000,000.00. In the letter, Distler notified ADP that if ADP rejected her proposal, the Debtor's

employees would begin contacting all of the providers' patients and direct them to pay the Debtor instead of ADP. (ADP's Exhibit 2C).

On July 19, 2006, Distler wrote a follow-up email to ADP. In the email, Distler wrote: "Attached is a copy of the letter I will send to 1400 offices this afternoon via a single fax blast submission if this situation is not decided and resolved within the next hour."

Attached to Distler's email is a letter addressed to "Dear Doctor," encouraging the doctors to contact their patients directly for payment. The letter also encourages the doctors to sue ADP "to stop the further collection" of the doctors' accounts by ADP, and to recover any funds already collected by ADP. (ADP's Exhibit 2D).

On the same day that ADP received the email from Distler, it filed a Verified Complaint for Injunctive Relief and Damages, and a Motion for Temporary Restraining Order and Preliminary Injunction against the Debtor, Distler, and a Nevada corporation known as mydds.com. The action was filed in the Second Judicial District Court of the State of Nevada, in the County of Washoe, and was assigned Case No. CV06–I688.

On July 19, 2006, the Nevada state court entered an Ex–Parte Temporary Restraining Order against the Debtor, Distler, and mydds.com. The Temporary Restraining Order (TRO) enjoins the Debtor, Distler, and mydds.com from, among other activities:

(a) Contacting the patients who are obligated to pay under the Contracts already purchased by ADP in any manner whatsoever for any reason whatsoever. . . .

. . .

(c) *Contacting and directing the dentists to follow up with ADP for the payment of any monies due and owing by E–Z Pay to the dentists:*

(d) Taking any actions whatsoever to make any changes to the balances of the existing contracts owned by ADP. . . .

. . .

(g) Taking any actions to interfere with ADP's security interest in the other contracts owned by E–Z Pay, but not purchased by ADP, which serve as collateral of ADP's recourse obligation.

(ADP's Exhibit 3A)(Emphasis supplied).

Later on July 19, 2006, Gangloff sent Distler an email regarding "Temporary Restraining Order." The email was sent to debbie@ezpayservices.com and to four other ezpay email addresses, and stated that the threats received by ADP "left us no choice but to obtain a restraining order to protect our interests." Gangloff also wrote that, "as you know the consequences to you and your employees of violating this Order could be severe." A copy of the TRO was attached to the email. (ADP's Exhibit 26).

On July 20, 2006, C. David Russell, as counsel for E–Z Pay Services, Inc., signed an Acceptance of Service of Verified Complaint for Injunctive Relief and Injunction, pursuant to which he acknowledged the receipt on that date of the Complaint, the Motion for TRO, a Notice of TRO, and Notice of Posting of Bond for TRO. (Doc. 25, Exhibit 11).

On July 21, 2006, a process server served the TRO by leaving a copy of the Order with Distler's son at her residential address in Jacksonville, Florida. (ADP's Exhibit 8B).

On July 25, 2006, six days after the entry of the TRO, Distler wrote an email to Gangloff and other ADP personnel. In the email, Distler wrote that "judging by

the attached letter, it looks like the doctors are organizing as we speak." Distler further wrote that "I just received this letter via fax, and since I had over 100 voice mails, calls and return calls today, I have no idea which doctor is organizing this. I know a lot of doctors have already called their patients directly, but this guy seems to have a handle on how to do it legally." (ADP's Exhibit 9B).

A five-page letter addressed to "Dear Doctor" was attached to the email. On its face, the letter purports to be written by an un-named dentist, who is identified only as a "fellow dentist" and a "fellow victim." The letter bears the caption: "URGENT E–Z PAY DOCTOR LAWSUITS ALERT—CALL YOUR LAWYER TODAY!"

The Dear Doctor letter states that a copy of ADP's TRO against the Debtor and Distler is attached, but that "the TRO does not apply to me or you!" The letter then advises the doctors to hire an attorney and have "your attorney go to your local court in your state and get a TRO against" ADP and its principals.

It is very important we all spend a few hundred dollars to file the underlying lawsuits and TRO motions against ADP and Duvera Financial. The doctors are in 48 states. This means ADP and Duvera Financial will be required to defend litigation in 48 states, which will prove costly and obviously more expensive then [sic] paying us as promised. The letter also advises the doctors to submit their lawsuits to Dunn & Bradstreet, and includes the personal contact information for the principals of ADP, with an invitation to "call these numbers day and night." (ADP's Exhibit 9B).

After July 25, 2006, ADP received "hundreds" of calls from dentists and their attorneys who had received a copy of the "Dear Doctor" letter, and a number of the dentists forwarded a copy of the letter to ADP. (June 15 Transcript, p. 42). Additionally, at least fourteen complaints were filed against ADP after July 25, 2006, and several of the complaints, including a Verified Class Action Complaint filed in Michigan, included a copy of the "Dear Doctor" letter as an exhibit in the lawsuit. (June 15 Transcript, pp. 43–44; ADP's Exhibit 21).

On August 1, 2006, the State Court in Nevada extended the TRO to August 11, 2006, pursuant to the stipulation of the parties. (ADP's Exhibit 3C).

On August 4, 2006, an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against the Debtor in Nevada.

On August 11, 2006, the State Court in Nevada extended the TRO to August 18, 2006, pursuant to the stipulation of the parties. (ADP's Exhibit 3D).

Also on August 11, 2006, ADP removed the State Court action to the Bankruptcy Court in Nevada. (Doc. 25, Exhibit 16).

On August 16, 2006, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code in Florida.

On August 22, 2006, following the removal of the state court action to the Bankruptcy Court, the Bankruptcy Court in Nevada extended the TRO to August 25, 2006, pursuant to the stipulation of the parties. (ADP's Exhibit 3E).

On August 28, 2006, the Bankruptcy Court in Nevada extended the TRO to September 1, 2006, pursuant to the stipulation of the parties. (ADP's Exhibit 3F).

On September 5, 2006, the Bankruptcy Court in Nevada extended the TRO to September 8, 2006, pursuant to the stipulation of the parties. (ADP's Exhibit 3G).

On September 25, 2006, after a hearing, the Bankruptcy Court in Nevada entered an Order for Modification and Extension of Temporary Restraining Order. The Order provided:

1. The language of the TRO is modified, effective September 5, 2006, to prohibit Defendants from directly or indirectly contacting any dentist, medical provider or any party to which an obligation may flow from the Debtor E–Z Pay Services, Inc. or any other party in interest.

2. The TRO is continued in effect until the date and time set for a hearing on ADP's Motion for Preliminary Injunction or further court order.

3. This order is without any prejudice to Defendants to seek modification or dissolution of the TRO.

(ADP's Exhibit 17).

No further modifications of the TRO appear in the record.

On February 25, 2007, five months after the entry of the Order for Modification and Extension of Temporary Restraining Order, Distler wrote a letter addressed to "Dear Doctors." (ADP's Exhibit 22). In the letter, Distler asserted that the "patient contracts" with the Debtor were deemed rejected because the Trustee had not assumed them in the Chapter 7 bankruptcy case. Distler also wrote:

All of the doctors can now contact their patients and direct the patients to pay them directly.... If you want to be sure you will have no problems with ADP trying to collect from your patients then spend a couple hundred dollars and have your attorney file a "Cease & Desist" or "TRO" emergency order with your local court. The order will simply ask the judge to order ADP to stop billing and collecting from your patients, demand that ADP turn any money they have collected on behalf of your patients over

to you immediately, and order ADP to not effect [sic] your patient's credit reports.... If ADP wants to fight you they will be required to show up in your court ... not theirs.... If you have an attorney make sure he files for your [sic] right away. Make sure to ask for all of the money ADP ever collected on your accounts.

(ADP's Exhibit 22). Distler sent the letter by email to an undetermined number of dentists around the country. (Transcript, July 27, 2007, hearing, pp. 66–69, 73).

## Discussion

In the Ex Parte Motion for Order to Show Cause and the Third Motion for Order to Show Cause that are currently before the Court, ADP contends that Distler violated the TRO originally issued by the State Court in Nevada by writing the "Dear Doctor" letters dated July 25, 2006, and February 25, 2007, and by distributing the letters to dentists who had contracted with the Debtor. As a sanction for Distler's contempt, ADP seeks an award of $1,000,000.00 in compensatory damages, and $1,000,000.00 in punitive damages, for a total award of $2,000,000.00. (July 27 Transcript, p. 202).

### I. "Jurisdiction"

Distler contends that this Court lacks jurisdiction to determine the contempt motions, because the TRO could not remain in effect for an indefinite period of time without the consent of the parties. In other words, Distler asserts that this Court lacks jurisdiction to enforce the TRO by considering the contempt motions, because the TRO expired "long before we ever got to these proceedings." (July 27 Transcript, pp. 11, 13, 16–17; Doc. 88, p. 11).

First, in a removed action, it is well-established that a federal court possesses the jurisdiction to enforce a temporary restraining order or injunction entered by a state court prior to removal. *New York State National Organization for Women v. Terry*, 697 F.Supp. 1324, 1330 (S.D.N.Y.1988)(A federal court's jurisdiction to enforce a prior judgment entered by a state court is the only way to give meaning to 28 U.S.C. § 1450, the federal removal statute.).

Instead, it appears that the issue actually raised by Distler simply involves a party's right to pursue a contempt action after the underlying TRO or preliminary injunction is dissolved or has expired. Generally, a TRO expires by its terms within ten days after its entry, unless extended in accordance with the procedural rules applicable to the order. Fed. R.Civ.P. 65(b); NRCP 65(b).

In this case, as set forth above, the TRO was initially entered on July 19, 2006, and extended by stipulation of ADP and Distler in accordance with five separate Orders entered on August 1, August 11, August 22, August 28, and September 5, 2006. (ADP's Exhibits 3C–3G). Each time that the TRO was extended, the agreed order was signed and approved by Distler's attorney.

After a hearing on September 5, 2006, the Court entered on September 25, 2006, an Order for Modification and Extension of Temporary Restraining Order, by which the TRO was modified and "continued in effect until the date and time set for a hearing on ADP's Motion for Preliminary Injunction or further court order." The Order further provided that it was "without any prejudice to Defendants to seek modification or dissolution of the TRO." (ADP's Exhibit 17).

In each instance, the TRO was extended after the original period because Distler claimed that she was ill and unable to travel from Florida to Nevada for the Court proceedings. (ADP's Exhibits 16, 27, 28). In a letter from Distler's attorney dated August 10, 2006, for example, he wrote that "Mrs. Distler is precluded from traveling through September, possibly into early October." (ADP's Exhibit 28).

All extensions were obtained with the participation of Distler's attorney. They were not entered without notice to Distler. Additionally, the extensions were granted because of the unavailability of Distler, the party now complaining about the extensions.

Moreover, the initial TRO was entered after hearing, and the September 25, 2006, Order was entered after hearing. At any time Distler could have called the motion for hearing.

Under these circumstances, the Court cannot find that the TRO had expired by October of 2006, as contended by Distler, so as to deprive this Court of jurisdiction to determine the contempt action currently at issue. (July 27 Transcript, pp. 16–17). The label placed on an order is not necessarily dispositive of its nature, *McDougald v. Jenson*, 786 F.2d 1465, 1472 (11th Cir.1986), and a TRO may be treated as a preliminary injunction. *Mitsubishi International Corporation v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1517 (11th Cir.1994).

Further, even if the TRO had expired by its terms, ADP is nevertheless entitled to seek damages based on violations of the order which occurred while it remained in effect. "Generally speaking, a person who violates an injunction or temporary restraining order during its pendency is subject to a compensatory civil contempt judgment, even if the injunction or restraining order later terminates due

to passage of time or mootness." *Reliance Insurance Company v. Mast Construction Company*, 84 F.3d 372, 376 (10 th Cir. 1996) (Citations omitted).

This Court possesses jurisdiction to hear and determine the contempt motions filed by ADP.

## II. Contempt

 Generally, "contempt of court is the disregard of judicial authority." *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 465 (S.D.Fla. 1998). An order of contempt is a sanction designed to compel compliance with a court order, or to compensate a party who has been harmed by another party's noncompliance. *South Beach Suncare, Inc. v. Sea & Ski Corporation*, 1999 WL 350458, at *5 (S.D.Fla.1999); *In re Spanish River Plaza Realty Company, Ltd.*, 155 B.R. 249, 253 (Bankr.S.D.Fla.1993).

 To obtain a finding of contempt, the moving party must show by clear and convincing evidence that the respondent has violated an outstanding court order. *SEC v. Kirkland*, 2007 WL 2381543, at *3 (M.D.Fla.2007); *Popular Bank of Florida v. Banco Popular de Puerto Rico.* 180 F.R.D. at 465; *In re Spanish River Plaza Realty Company, Ltd.*, 155 B.R. at 253.

 In presenting its clear and convincing evidence, the moving party must show that "(1) the allegedly violated order was valid and lawful; (2) the order was clear, definite and unambiguous; and (3) the alleged violator had the ability to comply with the order." *SEC v. Kirkland*, 2007 WL 2381543, at *3(quoting *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000)). The Court should only find a party in contempt if the order is clear and unambiguous, proof of noncompliance is clear and convincing, and the respondent has not been reasonably diligent in attempting to comply. *South Beach Suncare, Inc. v. Sea & Ski Corporation*, 1999 WL 350458, at *5.

 In other words, the moving party must prove by clear and convincing evidence that a violation of a court order occurred, and that the order was "valid and lawful as well as clear, definite and unambiguous." *In re SLK Associates, Inc.*, 166 B.R. 985, 989 (Bankr.S.D.Fla. 1994).

### A. The July 25, 2006 Letter

 In this case, the TRO was entered on July 19, 2006. The TRO prohibits Distler from "contacting and directing the dentists to follow up with ADP for the payment of any monies due and owing by E–Z Pay to the dentists," and from taking any actions to change the balances owed on the contracts purchased by ADP. (ADP's Exhibit 3A).

The Debtor's attorney signed an acceptance of service and acknowledgment of receipt of the TRO on July 20, 2006 (Doc. 25, Exhibit 11), and the TRO was served at Distler's residence in Florida on July 21, 2006 (ADP's Exhibit 8B).

Distler does not appear to contest the validity or lawfulness of the TRO. She never appealed or challenged its entry, and in fact consented to its extension on five separate occasions. (ADP's Exhibits 3C– 3G).

On July 25, 2006, Distler sent an email to Gangloff and other ADP personnel. The caption of Distler's email states that "The doctors are organizing." A five-page letter addressed to "Dear Doctor" is attached to the email. The attached letter purports to be written by an un-named dentist, who advises his "fellow" dentists to hire an attorney to sue ADP (1) to enjoin ADP from collecting any money from the dentists' patients, and (2) to re-

quire ADP to forward to the dentists all payments previously received from the dentists' patients. (ADP's Exhibit 9B).

After July 25, 2006, ADP received numerous telephone calls from dentists and their attorneys who had received a copy of the July 25 letter. Additionally, some of the dentists forwarded copies of the letter to ADP, and ADP was sued in at least fourteen actions in various jurisdictions around the country. (June 15 Transcript, pp. 42–44).

ADP contends that Distler wrote and transmitted the "Dear Doctor" letter, and that such conduct violated the express prohibitions set forth in the TRO.

It appears undisputed that the letter was written and sent while the TRO was in effect, and that the rendering of the advice contained in the letter represents conduct prohibited by the TRO. When asked whether the letter would have constituted a violation of the TRO had she sent it, for example, Distler answered, "Obviously." (July 27 Transcript, p. 123). The letter is dated only six days after the TRO was entered, and solicits the dentists to take legal action to recover patient receivables from ADP.

Distler contends, however, that she did not author the letter or send it to the dentists or providers who ultimately received it. (Transcript, July 27, 2007, hearing, pp. 122, 139). She contends that an unidentified doctor who had contracted with the Debtor actually wrote and sent the letter. (Transcript, pp. 123, 125–26).

According to Distler, she received a copy of the letter from the unknown dentist who wrote it on July 25, 2006. Distler testified that she received the letter on her computer as a Word document, and that she edited it only to correct the spelling of her name. She also testified that she spoke with the dentist who sent the letter,

but does not remember his name or who he is. Finally, Distler testified that she cannot remember the return email address of the doctor who wrote and sent her the letter. (July 27 Transcript, pp. 124, 128–31, 138).

Distler's home computer was examined by Christopher Smoot (Smoot), an IT consultant. (June 15 Transcript, p. 90). Smoot testified that the July 25 letter was created on Distler's home computer, and that no other computer contributed to the document. According to Smoot, the letter was created on Distler's computer, and edited on the same computer eleven times. All of the software on the computer that created the file was registered in Distler's name, and was password protected under Distler's profile. Finally, if the letter had been created elsewhere and emailed to Distler, Smoot testified that the document would have retained the name of the original author in its properties. (June 15 Transcript, pp. 100–02, 112, 115). Smoot's findings are contained in a report that was admitted into evidence as ADP's Exhibit 18.

Distler did not present any evidence to challenge Smoot's analysis or conclusions, or to show how any person other than Distler could have created the document.

Distler's testimony regarding her receipt of the letter from an anonymous doctor is disproved by the forensic evidence in the case. The Court has evaluated the testimony and report prepared by Smoot, and is satisfied that the letter was generated and edited on Distler's home computer, with software registered in Distler's name. The evidence also shows that no computer other than Distler's contributed to the creation of the letter.

The Court finds that Distler authored the July 25, 2006, letter, and distributed it to numerous doctors who had contracted with the Debtor.

The evidence shows that Distler forwarded the Dear Doctor letter to ADP on July 25, and her transmittal note to ADP indicates that she understood the letter's significance. (ADP's Exhibit 9B). Distler claims, of course, that she had received the Dear Doctor letter in an email from an unknown source. Given her awareness of the letter's significance, however, Distler's inability to remember the identity of the letter's purported author (even after speaking to him on the telephone) is simply not credible.

It is also noteworthy that her inability to identify the purported author precludes ADP from verifying Distler's claim that the letter was actually written by a disgruntled dentist.

Under these circumstances, the Court finds that Distler violated the TRO entered on July 19, 2006, by writing and distributing the "Dear Doctor" letter dated July 25, 2006. At trial, Distler acknowledged that she knew the TRO prohibited her from distributing the July 25 letter. (July 27 Transcript, p. 124). The validity or lawfulness of the TRO was never challenged, and Distler clearly understood its terms. Distler's conduct in violating the TRO constitutes an act of contempt.

**B. The February 25, 2007 Letter**

██ On February 25, 2007, Distler sent an additional letter addressed to "Dear Doctors" to dentists across the country who had contracted with the Debtor. (ADP's Exhibit 22). In the letter, Distler wrote that the "patient contracts" with the Debtor were deemed rejected because the Trustee had not assumed them in the Chapter 7 case. Consequently, Distler advised the dentists to contact their patients and seek payment directly from the patients to the dentists. She also advised the dentists to sue ADP for an order prohibiting ADP from collecting any further payments from the patients.

Unlike the July 25 letter, Distler concedes that she wrote and distributed the February 25 letter to dentists around the country. (July 27 Transcript, pp. 69, 73, 142). Distler contends, however, that the TRO was no longer in effect in February of 2007, so that the transmittal of the letter did not constitute a violation of any court order.

Specifically, Distler testified that she believes the TRO was in effect from July 19, 2006, the date it was entered, until August 4, 2006, the date that the involuntary bankruptcy petition was filed against the Debtor in Nevada. (July 27 Transcript, pp. 115–16, 143, 148–49). Distler testified, for example, that her attorney, Jeff York, informed her that the TRO "was no longer anything" after the involuntary petition was filed. (July 27 Transcript, p. 115). Distler also testified that she understood from a meeting with the Chapter 7 Trustee and the Trustee's attorney in August of 2006 that the TRO was "null and void" because of the bankruptcy petitions that had been filed that month. (July 27 Transcript, pp. 61, 147–48).

██ Distler's testimony regarding the effect of the bankruptcy petitions on the TRO is unavailing. First, the TRO was expressly directed to Distler individually, as well as to the Debtor and a third entity known as mydds.com. Although Distler is an officer of the Debtor, she is not personally a debtor in any bankruptcy case. Consequently, any protection provided by the Bankruptcy Code did not extend to Distler individually, and did not affect the enforceability of the state court order as against her. *In re CCDC Financial Corporation*, 143 B.R. 946 (D.Kan.1992)(The filing of a bankruptcy case did not protect the debtor's non-debtor president against the enforcement of a prepition order re-

quiring him to pay money into the district court registry.)

■ Second, the TRO was initially entered on July 19, 2006, in connection with a State Court action commenced by ADP in Nevada. The involuntary bankruptcy petition was filed against the Debtor on August 4, 2006. On August 11, 2006, ADP removed the State Court action to the Bankruptcy Court pursuant to 28 U.S.C. § 1452. (Adv. Doc. 1).

Following the removal of the action, the Bankruptcy Court in Nevada entered four separate orders extending the effect of the TRO. The first three Orders extending the TRO were entered pursuant to the express consent and stipulation of Distler and the other defendants. (ADP's Exhibits 3E, 3F, and 3G). The fourth Order was specifically entered "without any prejudice to Defendants to seek modification or dissolution of the TRO." (ADP's Exhibit 17). During the proceedings, Distler never asserted to the Bankruptcy Court in Nevada that the extensions were not appropriate because the TRO was "null and void."

In October of 2006, the removed action was transferred to this Court. (Adv. Docs. 19, 20, 21). Neither Distler nor any other party has requested modification or dissolution of the TRO following the transfer.

Under these circumstances, Distler cannot claim that the TRO was not in effect after the filing of the bankruptcy petitions in August of 2006. The State Court action was removed to the Bankruptcy Court, and Distler consented, postpetition, to four extensions of the TRO. She has never sought relief from the terms of the TRO as expressly permitted by the Bankruptcy Court in Nevada.

■ Finally, even if Distler did believe that the TRO was no longer in effect, that belief would not excuse her violation of the Order. The standard for evaluating civil contempt differs from the standard for evaluating criminal contempt. *South Beach Suncare. Inc. v. Sea & Ski Corporation*, 1999 WL 350458, at *5. "The focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *SEC v. Kirkland*, 2007 WL 2381543, at *4(quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990)). A party seeking a finding of civil contempt is not required to establish that the respondent intended to violate a Court order. *South Beach Suncare, Inc. v. Sea & Ski Corporation*, 1999 WL 350458, at *5; *In re Spanish River Plaza Realty Company, Ltd.*, 155 B.R. at 253. A finding of civil contempt is warranted where the enjoined party violated the order, even though he believed that the order was invalid. "The proper method to challenge the validity" of an injunction is to file an appeal or otherwise seek review of the order. *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 180 F.R.D. at 466.

For the reasons discussed above, the Court finds that Distler violated the TRO entered on July 19, 2006, by writing and distributing the "Dear Doctors" letter dated February 25, 2007. The binding effect of the TRO on Distler, a nondebtor, was not terminated by the filing of the bankruptcy petitions in August of 2006. Additionally, Distler consented to the extension of the TRO postpetition in the removed action, and her subjective belief as to the enforceability of the TRO does not excuse her violation. Distler's conduct in writing and distributing the February 25 letter constitutes an act of contempt.

## III. Damages

The Court has determined that Distler violated the TRO initially entered by the

Nevada State Court and extended pursuant to stipulation and by Order of the Bankruptcy Court in Nevada, by writing and distributing the letters dated July 25, 2006, and February 25, 2007. The next issue, therefore, is the appropriate measure of damages that may be awarded to ADP as a sanction for the violations.

ADP seeks an award of $1,000,000.00 in compensatory damages, and $1,000,000.00 in punitive damages, for a total award of $2,000,000.00, based on Distler's violations of the TRO. (July 27 Transcript, p. 202; Doc. 95, p. 6).

### A. Compensatory damages

■■■ "The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." *Leadsinger, Inc. v. Cole,* 2006 WL 2266312, at *16 (S.D.N.Y.2006); *In re Jove Engineering, Inc.,* 92 F.3d 1539, 1557 (11th Cir.1996); *Theatre Confections, Inc. v. Sunstar Theatres Coral Springs, LLC,* 2003 WL 21730694, at *1 (W.D.N.Y.2003).

■■■ Compensatory damages "should reimburse the injured party for its actual damages." Actual damages, in turn, "must be established by competent evidence and the amount must not be arrived at by mere speculation or conjecture." *Leadsinger, Inc. v. Cole,* 2006 WL 2266312, at *16. "Compensatory sanctions should reimburse an injured party for its actual damages and may not be imposed absent some proof of actual loss." *Theatre Confections, Inc. v. Sunstar Theatres Coral Springs, LLC,* 2003 WL 21730694, at *1.

In this case, ADP's claim for compensatory damages consists of two components: (1) approximately $700,000.00 in attorney's fees spent to defend the lawsuits triggered by Distler's letters, and (2) the sum of $254,867.50 charged by a billing company for its "excess management time." To

support its claim for compensatory damages, ADP presented the trial testimony of Gangloff, and the deposition testimony of Richard Victor.

■■■ Gangloff testified that ADP received hundreds of telephone calls from dentists and their lawyers after the July 25, 2006, letter was sent to the dentists. Gangloff also testified that at least fourteen lawsuits were filed against ADP and its principals after the letter was sent, and that ADP had spent almost $700,000.00 in attorney's fees to defend itself against the lawsuits. Finally, Gangloff testified that ADP had to pay its billing company, Duvera Financial, more than $250,000.00 as compensation for the additional time and expenses incurred by Duvera on the accounts after July 25, 2006. (June 15 Transcript, pp. 42, 44, 48).

In connection with the additional compensation paid to Duvera, ADP submitted the deposition testimony of Richard Victor (Victor), the director of billing and collections for Duvera. (ADP's Exhibit 20). According to Victor, Duvera services a portfolio of dental financing contracts for ADP, which contracts were originated by the Debtor. (ADP's Exhibit 20, p. 8). Victor testified that Duvera received approximately 25 to 50 calls related to the ADP/Debtor portfolio between June of 2005 and June of 2006. (ADP's Exhibit 20, p. 9).

Victor received a copy of Distler's July 25, 2006, letter on July 26, 2006, from a doctor in Arizona. (ADP's Exhibit 20, p. 11). When asked about the impact of the letter on Duvera's call volume, Victor testified that his personal call volume increased from one hour and 36 minutes on July 26, 2006, to seven hours and twenty-four minutes on July 27, 2006. (ADP's Exhibit 20, p. 12). Victor also testified that Duvera received approximately 120 to 150 calls per

day during the thirty days after the letter was distributed, an increase of approximately 300% over the pre-July 26 period. (ADP's Exhibit 20, pp. 14–15).

Finally, Victor testified that Duvera billed ADP the total sum of $254,867.50 between August of 2006 and May of 2007 on account of the increased call volume. According to Victor, the bills represented the "excess management time" for handling calls related to the ADP/Debtor portfolio during the ten-month period beginning in August of 2006. (ADP's Exhibit 20, pp. 15–16). A "summary of invoices" is attached to Victor's deposition transcript. (ADP's Exhibit 20, Attachment 4). The summary sets forth the specific amount charged for Duvera's additional services on a monthly basis.

The Court has reviewed the evidence, and finds that ADP is entitled to an award of compensatory damages in the amount of $254,867.50 based on the charges billed by Duvera for its "excess management time." The damages are supported by the competent, detailed testimony of Duvera's representative regarding (1) the additional services required by Duvera as a result of Distler's conduct, and (2) the costs charged to ADP as compensation for those services.

The Court also finds, however, that ADP did not satisfactorily establish compensatory damages for attorney's fees in defending the lawsuits produced by Distler's letters.

Gangloff testified that at least fourteen lawsuits were filed against ADP after July 25, 2006, and that ADP spent almost $700,000.00 in attorney's fees to defend the actions. (June 15 Transcript, pp. 44, 48). Other than Gangloff's testimony and a copy of one Complaint (ADP's Exhibit 21), however, ADP did not present any independent evidence to document the fees.

First, ADP did not furnish adequate information relating to the lawsuits in which it incurred the fees. No evidence appears in the record, for example, as to the specific location of the lawsuits or the courts in which they were filed, the case numbers assigned to the lawsuits, the parties involved, or the causes of action alleged.

Additionally, ADP did not produce any retention agreements with the attorneys hired to represent it in the lawsuits, any invoices or cost statements submitted by the attorneys, any correspondence from the unidentified attorneys, or proof that any of the fees and costs have been paid. Essentially, the only evidence in the record regarding the $700,000.00 in defense costs claimed by ADP is Gangloffs generalized, unsupported testimony.

In short, ADP's claim for compensatory damages in the amount of $1,000,000.00 is based on two components: (1) approximately $700,000.00 in attorney's fees spent to defend the lawsuits triggered by Distler's letters; and (2) the sum of $254,867.50 charged by Duvera for its "excess management time." The Court has reviewed the evidence with respect to both of these components, and finds that ADP is entitled to an award of compensatory damages in the amount of $254,867.50 based on the charges billed by Duvera for its excess management time. ADP did not sufficiently establish, however, that it is entitled to an award of any damages for the attorney's fees that it incurred in defending the lawsuits produced by Distler's letters.

### B. Punitive damages

ADP also seeks an award in the amount of $1,000,000.00 as punitive damages based on Distler's violations of the TRO. The Court declines to issue an award of punitive damages.

Generally, a sanction may be considered a remedy for civil contempt if it is "remedial, and for the benefit of the complainant," whereas a sanction may be considered a remedy for criminal contempt if it is "punitive, to vindicate the authority of the court." *In re Williams,* 213 B.R. 189, 193 (Bankr.M.D.Ga.1997).

As set forth above, the Eleventh Circuit Court of Appeals has determined that the purpose of civil contempt sanctions is either to compensate the complaining party for actual losses, or to coerce the offending party into complying with the court order. *In re Jove Engineering, Inc.,* 92 F.3d at 1557 (11th Cir.1996). According to the Eleventh Circuit, however, sanctions imposed for civil contempt should not be any greater than necessary to ensure compliance with the order. *In re Jove Engineering,* 92 F.3d at 1558. To the extent that a sanction exceeds the amount necessary to coerce compliance, it may represent a sanction for criminal contempt, which cannot be imposed without the due process safeguards guaranteed to criminal defendants. See *Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1304 (11th Cir.1991); *Armstrong v. Bailey,* 2000 WL 33363300, at *4 (D.Utah 2000).

In this case, the Court is awarding compensatory damages to ADP in the amount of $254,867.50. Such an award is sufficient to serve the dual purpose of civil contempt actions to secure future compliance with the Court's orders, and to compensate ADP for its losses.

The Court finds that an additional award of punitive damages, as requested by ADP, exceeds the amount necessary to ensure compliance with the Court's Order, and is therefore not appropriate under the guidelines established by *Jove Engineering,* Consequently, the Court declines to enter such an award of punitive damages in this civil contempt action.

## Conclusion

The issue presented in this case is whether Distler violated the terms of a TRO initially entered on July 19, 2006, by the State Court in Nevada and extended pursuant to stipulation and by Order of the Bankruptcy Court in Nevada, by soliciting certain medical providers to sue ADP for the recovery of payments owed or remitted on the providers' patient accounts. The Court has jurisdiction to consider and resolve this matter.

First, the Court finds that Distler violated the TRO by writing and distributing the "Dear Doctor" letter dated July 25, 2006. Distler authored the letter on her home computer, and sent it to numerous doctors who had contracted with the Debtor.

Second, the Court finds that Distler violated the TRO by writing and distributing the "Dear Doctor" letter dated February 25, 2007. Distler cannot claim that she is excused from the violation because she believed that the TRO was no longer in effect after the bankruptcy petitions were filed in August of 2006.

The Court finds that ADP is entitled to an award of compensatory damages in the amount of $254,867.50, based on the charges billed by Duvera for the "excess management time" caused by Distler's violations. ADP did not sufficiently establish, however, that it is entitled to an award of any damages for the attorney's fees that it incurred in defending the lawsuits produced by Distler's letters. Additionally, ADP is not entitled to the punitive damages that it requests, since such an award appears inconsistent with the purpose underlying actions for civil contempt.

Accordingly:

**IT IS ORDERED** that:

1. The Ex Parte Motion for Order to Show Cause Why Defendants Should not be Held in Contempt for Violation of Ex Parte Temporary Restraining Order, and the Third Motion for Order to Show Cause Why Ms. Distler Should not be Held in Contempt for Violating Temporary Restraining Order, filed by Alternative Debt Portfolios, L.P. and Alternative Debt Portfolios, LLC, are granted in part and denied in part as set forth in this Order.

2. Debra Distler violated the Ex–Parte Temporary Restraining initially entered by the State Court in Nevada on July 19, 2006, and extended pursuant to stipulation and by Order of the Bankruptcy Court in Nevada, by writing the letters dated July 25, 2006, and February 25, 2007, and by distributing them to medical providers who had contracted with the Debtor. The violations constitute acts of contempt.

3. Compensatory damages are awarded in favor of the Plaintiffs, Alternative Debt Portfolios, L.P. and Alternative Debt Portfolios, LLC, and against the Defendant, Debra Distler, in the amount of $254,867.50.

4. The Plaintiffs' request for punitive damages is denied.

## ORDER ON MOTION FOR CLARIFICATION AND LIMITED RECONSIDERATION OF THIS COURT'S ORDER ON (1) EX PARTE MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANT SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING EX PARTE TEMPORARY RESTRAINING ORDER AND (2) THIRD MOTION FOR ORDER TO SHOW CAUSE WHY MS. DISTLER SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING RESTRAINING ORDER

**THIS CASE** came before the Court for hearing on May 2, 2008, to consider the Motion for Clarification and Limited Reconsideration of this Court's Order on (1) Ex Parte Motion for Order to Show Cause Why Defendants Should not be Held in Contempt for Violation of Ex Parte Temporary Restraining Order, and (2) Third Motion for Order to Show Cause Why Ms. Distler Should not be Held in Contempt for Violating Restraining Order. (Doc. 106).

The Motion for Clarification and Limited Reconsideration was filed by the Plaintiffs, Alternative Debt Portfolios, L.P. and Alternative Debt Portfolios, LLC (collectively, ADP).

On March 19, 2008, the Court entered an Order on (1) Ex Parte Motion for Order to Show Cause Why Defendants Should not be Held in Contempt for Violating Ex Parte Temporary Restraining Order and (2) Third Motion for Order to Show Cause Why Ms. Distler Should not be Held in Contempt for Violating Temporary Restraining Order (the Order). (Doc. 100).

In the Order, the Court concluded that:

Debra Distler violated the Ex–Parte Temporary Restraining Order initially entered by the State Court in Nevada on July 19, 2006, and extended pursuant to stipulation and by Order of the Bankruptcy Court in Nevada, by writing the letters dated July 25, 2006, and February 25, 2007, and by distributing them to medical providers who had contracted with the Debtor. The violations constitute acts of contempt.

(Doc. 100, p. 24).

Based on the finding that Debra Distler (Distler) violated the Temporary Restraining Order (TRO), the Court awarded compensatory damages in favor of ADP, and against Distler, in the amount of $254,867.50. (Doc. 100, p. 24). The amount awarded as compensatory dam-

ages was based on the charges billed by Duvera Financial, ADP's billing company, for the "excess management time" caused by Distler's violations. (Doc. 100, pp. 18–23).

In the Motion currently before the Court, ADP seeks clarification or reconsideration of the Court's Order with respect to three issues. The Court will address each issue separately.

### 1. The Chapter 7 estate is not liable for the damages awarded to ADP.

■■■■ First, ADP seeks the entry of a modified Order determining that the Chapter 7 estate of EZ Pay Services, Inc. is jointly liable with Distler for the compensatory damages awarded to ADP as a result of Distler's violations of the TRO. The Court finds that the estate is not liable for the award.

The evidence established that Distler authored and distributed the letters dated July 25, 2006, and February 25, 2007, in violation of the TRO originally entered in Nevada. Distler apparently served as the Debtor's Chief Executive Officer (CEO) at the time that the letters were written.

The evidence did not establish, however, that Distler's authorship and circulation of the letters fell within the scope of her duties as the Debtor's CEO, or that the authorship and distribution of the letters was in the Debtor's financial interest. On the contrary, the evidence established that Distler acted independently and without regard to her obligations to the corporation when she authored the letters.

■■■■ Generally, a corporate officer's conduct is not imputed to the corporation if the officer's conduct is adverse to the corporation. *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736–37 (11th Cir.1998). Under general agency princi-

ples, as applied in the corporate context, an officer's actions are not imputed to the corporation where the officer is acting in his own behalf, and not in any official or representative capacity. *In re Parmalat Securities Litigation*, 383 F.Supp.2d 587, 597 (S.D.N.Y.2005).

In this case, Distler knew that the TRO had been entered against both Distler and the Debtor, as co-defendants in the lawsuit initiated by ADP in Nevada. Distler did not contest the validity or lawfulness of the TRO. (Doc. 100, p. 12). Instead, Distler engaged in conduct that violated the TRO by authoring and distributing the two letters.

Distler did not hold herself out as a representative of the Debtor when she wrote the first letter. Instead, the first letter was purportedly written by an unnamed dentist addressing his "fellow" dentists. (Order, Doc. 100, p. 12). In other words, as asserted by ADP in its Post–Trial Brief, Distler authored the letter while "posing as an anonymous dentist." (Doc. 95, p. 2). The letter was written on Distler's home computer, using software registered in Distler's name. (Order, Doc. 100, pp. 13–14).

With respect to the second letter, Distler apparently knew that the content of the letter conflicted with the terms of the TRO, but claimed that she erroneously believed that the TRO was not in effect when she circulated the letter. (Order, Doc. 100, p. 15). As discussed in the Order, such a belief does not excuse her violation of the TRO. (Order, Doc. 100, pp. 17–18).

Distler's conduct in knowingly and deceptively violating an injunction that was directed to both Distler and to the Debtor was clearly outside the scope of her responsibilities as a corporate officer. By exposing the Debtor to the risks associated with violating a valid Court Order, Distler

engaged in conduct that was inconsistent with the financial interest of the Debtor. Under these circumstances, Distler's conduct should not be imputed to the Debtor. The Chapter 7 estate of EZ Pay Services, Inc. is not jointly liable with Distler for the compensatory damages awarded to ADP.

### 2. ADP did not establish its entitlement to an award of the attorney's fees that it incurred in defending the lawsuits.

Second, ADP seeks the entry of an amended Order providing for an additional award of compensatory damages in the amount of $548,112.76. ADP claims that this amount represents the attorney's fees and costs that it incurred in defending the lawsuits triggered by Distler's letters.

In the Order, the Court determined that ADP did not sufficiently establish its entitlement to an award based on the fees and costs. (Doc. 100, pp. 18–22).

Specifically, the Court found that the only evidence presented by ADP to establish the claim was the generalized, unsupported testimony of Eric Gangloff, as managing director of ADP, that at least fourteen lawsuits had been filed, and that ADP had spent almost $700,000.00 in attorney's fees to defend the actions. No evidence was presented, however, to identify the lawsuits, or to show ADP's agreements with the attorneys who were retained to represent it in the lawsuits. (Doc. 100. p. 21).

ADP does not appear to assert that the evidence admitted at the final evidentiary hearing on the motions establishes the claimed award of $700,000.00. Instead, in its Motion for Clarification or Reconsideration, ADP provides certain information regarding eight adversary proceedings that were transferred to the Bankruptcy Court, and five additional proceedings that were dismissed in their original venue. (Doc.

106, pp. 7–12). Further, ADP attached an exhibit to its Motion for Clarification or Reconsideration, which consists of a list of law firms engaged by ADP, and the amount that ADP claims that it paid to each firm, which amounts total $548,112.76. (Doc. 106, Exhibit A).

The filing of the exhibit represents the first time that the fee information appears in the record of this proceeding. No evidence regarding the identity of the law firms, the services that they performed, or the amount paid to each, was presented at the trial. Any determination at trial regarding the amount of the fees incurred would have been "mere speculation or conjecture." *Leadsinger, Inc. v. Cole,* 2006 WL 2266312, at *16 (S.D.N.Y.2006).

"The Eleventh Circuit Court of Appeals has described a motion for reconsideration as falling within the ambit of either Federal Rule of Civil Procedure Rule 59(e) (motion to alter or amend a judgment) or Federal Rule of Civil Procedure Rule 60(b) (motion for relief from judgment) (citation omitted).... *The purpose of a motion for reconsideration is to correct manifest errors of law, to present newly discovered evidence, or to prevent manifest injustice.* (citation omitted)." *In re Waczewski,* 2008 WL 595926, at *1 (M.D.Fla.2008)(Emphasis supplied).

In this case, the Court finds that ADP has not satisfied the standard required for reconsideration of the compensatory damages awarded in the Order. The final evidentiary hearing of the motions was properly noticed, and occurred on two separate days in June and July of 2007. ADP had a full opportunity to litigate its claims, and to present its evidence relating both to the motions.

The information that ADP now seeks to introduce was available to ADP at the time of trial. ADP knew the identity of the attorneys that it had retained a year earlier to defend the lawsuits, and it knew the

amounts that those attorneys had charged for their services as of the trial date. The information attached to ADP's Motion for Clarification and Reconsideration is not "newly discovered" evidence within the meaning of Rule 60(b). See *In re Asbestos Litigation,* 173 F.R.D. 87, 90 (S.D.N.Y. 1997)(The moving party must show that the evidence is "truly newly discovered or could not have been found by due diligence.").

Further, the presentation of evidence on the motions was closed and the hearing was concluded on July 27, 2007, and ADP submitted its Post–Trial Brief on September 17, 2007. (Doc. 95). At the hearing on its Motion for Reconsideration, however, ADP appeared to request that the Court schedule further proceedings so that it could present additional evidence to establish its claim for attorney's fees. The Court denies ADP's request, because the evidence that it seeks to introduce is not newly-discovered information, as set forth above. Additionally, ADP has not provided a compelling explanation for its failure to present the evidence at trial.

In summary, ADP did not establish at trial that it is entitled to an award of compensatory damages based on the attorney's fees that it incurred in defending the lawsuits. ADP should not now be permitted to present evidence to support its claim for attorney's fees, because the information that it seeks to present is not "newly discovered evidence" within the meaning of Rule 60(b) of the Federal Rules of Civil Procedure, and because the post-trial introduction of the information is not necessary to prevent manifest injustice.

### 3. ADP is entitled to the entry of a separate Final Judgment consistent with the Order.

Finally, ADP asks the Court to enter a separate Final Judgment in its favor for the amount awarded to it in the Order.

Rule 52(c) of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure, provides:

**Rule 52. Findings and Conclusions by the Court; Judgment on Partial Findings**

. . .

**(c) Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

F.R.Civ.P. 52(c). Further, Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Rule 7054 of the Federal Rules of Bankruptcy Procedure, provides:

**Rule 54. Judgment; Costs**

. . .

**(b) Judgment on Multiple Claims or Involving Multiple Parties.** When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines *that there is no just reason for delay.* Otherwise, any order or other decision, however designated, that adjudicates fewer than all

the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

F.R.Civ.P. 54(b)(Emphasis supplied).

In this case, on March 19, 2008, the Court entered an Order on (1) Ex Parte Motion for Order to Show Cause Why Defendants Should not be Held in Contempt for Violation of Ex Parte Temporary Restraining Order, and (2) Third Motion for Order to Show Cause Why Ms. Distler Should not be Held in Contempt for Violating Temporary Restraining Order. (Doc. 100). The Order contains the Court's findings of fact and conclusions of law with respect to ADP's Motions. The Court determines that there is no just reason for delay, and that a Final Judgment should be entered in favor of ADP, and against Distler, consistent with the Order entered on March 19, 2008.

### Conclusion

ADP filed a Motion for Clarification and Limited Reconsideration of this Court's Order (1) determining that Debra Distler violated the TRO initially entered by the State Court in Nevada, and (2) awarding compensatory damages to ADP in the amount of $254,867.50. (Doc. 106). The Court grants ADP's Motion in part, and denies the Motion in part, as set forth in this Order.

First, the Motion should be denied to the extent that ADP seeks the entry of a modified Order determining that the Chapter 7 estate of EZ Pay Services, Inc. is jointly liable with Distler for the compensatory damages awarded to ADP. Distler's conduct should not be imputed to the Debtor, because she was not acting as a representative of the Debtor when she violated the TRO, and because the violations were adverse to the Debtor's financial interest.

Second, the Motion should be denied to the extent that ADP seeks an additional award of compensatory damages based on the attorney's fees that it incurred in defending the lawsuits triggered by Distler's violations. ADP did not establish its entitlement to the additional award at the final evidentiary hearing on the motions. It should not now be permitted to present evidence to support the additional award, because the proffered information is not "newly discovered evidence" within the meaning of Rule 60(b) of the Federal Rules of Civil Procedure, and because the post-trial introduction of the information is not necessary to prevent manifest injustice.

Finally, the Motion should be granted to the extent that ADP seeks the entry of a separate Final Judgment awarding it the sum of $254,867.50, consistent with the Court's Order entered on March 19, 2008.

Accordingly:

**IT IS ORDERED** that:

1. The Motion for Clarification and Limited Reconsideration of this Court's Order on (1) Ex Parte Motion for Order to Show Cause Why Defendants Should not be Held in Contempt for Violating Ex Parte Temporary Restraining Order and (2) Third Motion for Order to Show Cause Why Ms. Distler Should not be Held in Contempt for Violating Restraining Order, filed by Alternative Debt Portfolios, LLC and Alternative Debt Portfolios, L.P., is granted in part and denied in part as set forth herein.

2. The Motion is granted to the extent that ADP seeks the entry of a Final Judgment in favor of ADP, and against Debra Distler, based on the compensatory damages awarded to ADP in the amount of

$254,867.50. A separate Final Judgment shall be entered consistent with the Order entered on March 19, 2008.

3. The Motion is denied to the extent that ADP otherwise seeks the reconsideration or modification of the Order entered on March 19, 2008.